Counsel of Record:
ANDREW M. CALAMARI
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

------------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,** :
  :
                     **Plaintiff,** :       **15 Civ.**     (   )
  :
      **-against-** :       <u>**COMPLAINT**</u>
  :
**ADAM S. GOTTBETTER, MITCHELL G. ADAM,** :
**and K. DAVID STEVENSON,** :
  :
                     **Defendants.** :

------------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Adam S. Gottbetter ("Gottbetter") (who, upon information and belief, currently

resides at 147 Coconut Palm Road, Boca Raton, Florida 33432), Mitchell G. Adam ("Adam")

(who, upon information and belief, currently resides at 3858 W. 24th Ave., Vancouver, British

Columbia, Canada), and K. David Stevenson ("Stevenson") (who, upon information and belief,

currently resides at 11 Ocean Point, West Vancouver, British Columbia, Canada), alleges:

## SUMMARY

1.      This case involves three schemes to inflate the stock price of three separate publicly traded securities.  Each of the schemes was devised and orchestrated by Gottbetter, a well-known New York micro-cap securities and transactional lawyer.

2.      In all three, Gottbetter played the central role of architect and facilitator, using his law office as the headquarters for the planning and implementation of the schemes.  In all three, Gottbetter arranged the purchase of public company shells by business partners and their nominees; arranged for the shell's acquisition of private operating companies; recruited "traders" to engage in manipulative matched trades to inflate the stock price; and planned or approved promotional campaigns that touted the public companies' prospects to entice innocent investors to buy the stock at inflated prices.  Gottbetter and his partners planned to pump the companies' stock prices and then sell the shares they controlled, reaping massive profits.

3.      In the first scheme, launched in 2007, Gottbetter realized his goal through the manipulation of the stock of Kentucky USA Energy, Inc. ("KYUS"), a company involved in natural gas production.  In the KYUS scheme, Gottbetter recruited a stock promoter and trader (the "Trader") to design and implement a promotional campaign and to engage in a series of matched trades, all designed to inflate the stock price of KYUS.  The KYUS scheme generated approximately $12 million in gross proceeds for the scheme participants.

4.      In the second scheme, in the spring of 2013, Gottbetter recruited the Trader to come out of retirement to engage in the same manipulative trading and promotional activities as he had executed in the KYUS scheme, this time to inflate the stock price of Dynastar Holdings, Inc. ("DYNA"), a company that holds itself out as a social media and direct marketing business. Although the Trader began his manipulative trading in June 2013, Gottbetter put that scheme on

hold, in part because Gottbetter had been approached by Adam and Stevenson with an even bigger – and potentially more lucrative – scheme.

5.    In July 2013, Adam and Stevenson, veteran stock promoters with connections in the United States, Canada and Europe, approached Gottbetter to put together the most ambitious of the three schemes.  In a series of telephone calls and meetings beginning in late July 2013, Gottbetter, Adam and Stevenson hatched their plan to drive up the price of the common stock of HBP Energy Corp. ("HBPE") – a company purportedly intended to engage in oil drilling and extraction – through pre-arranged matched trades and an extensive promotional campaign, all with the ultimate goal of dumping their own shares on unsuspecting investors at the inflated prices.  Gottbetter, Adam and Stevenson recruited the Trader to manipulate the stock price – specifically, to "walk up" the stock price and reported market volume and to create the false appearance of liquidity and investor interest in the stock.

6.    In October 2013, Adam and Stevenson executed the first open-market trades in the HBPE manipulation scheme, including a series of matched trades between accounts they controlled.

7.    Throughout the planning of the DYNA and HBPE schemes, Gottbetter knew that the schemes were unlawful.  In plotting the HBPE scheme, Gottbetter, Adam and Stevenson repeatedly warned each other of the dangers of missteps that might draw the attention of regulators and the importance of keeping Adam's and Stevenson's identities secret.  The three even rehearsed the stories they would tell if questioned by law enforcement.  In a meeting on September 11, 2013, Gottbetter complained about the complexities of the stock manipulation business, but conceded that the only other way he could think of to create so much "liquidity" – that is, cash – so quickly was "robbing a bank."

8.      By orchestrating and engaging in the KYUS scheme, Gottbetter violated the securities registration and the anti-fraud provisions of the Securities Act of 1933 ("Securities Act"), and by engaging in the KYUS, DYNA and HBPE schemes, Gottbetter violated or aided and abetted violations of the anti-fraud provisions of the Securities Exchange Act of 1934 ("Exchange Act").  By orchestrating and engaging in the HBPE scheme, Adam and Stevenson each violated or aided and abetted violations of the anti-fraud provisions of the Exchange Act.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

9.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Sections 21(d)(1) and 21(d)(5) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(5), seeking a final judgment: (a) permanently restraining and enjoining each Defendant from engaging in the acts, practices and courses of business alleged herein; (b) prohibiting each Defendant from participating in any offering of penny stock pursuant to Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6) and, as to Gottbetter, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g); (c) requiring each Defendant to disgorge ill-gotten gains and to pay prejudgment interest thereon; and (d) imposing civil money penalties on each Defendant pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3) and, as to Gottbetter, pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a), and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

11.     Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Some of the acts, practices, courses of business and transactions constituting the violations alleged herein occurred within the District of New Jersey.  For example, the sales of unregistered KYUS securities, and the manipulative trades that the Trader placed as part of the DYNA scheme were executed or cleared, in part, through broker-dealers located in the District of New Jersey.  Additionally, the Trader's purchase of a block of HBPE stock from accounts controlled by Adam and Stevenson was made through wire transfers that originated from the District of New Jersey, and the HBPE stock certificate issued to the Trader's nominee as a result of that purchase was mailed to the nominee's address in the District of New Jersey.

12.     Each of Gottbetter, Adam and Stevenson, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

## DEFENDANTS

13.     **Gottbetter**, age 47, currently resides in Palm Beach County, Florida, but, during the manipulation schemes alleged herein, resided in New York, New York.  Gottbetter is a licensed attorney and, at all relevant times, owned a law firm and a broker-dealer registered with the Commission.

14.     **Adam**, age 47, resides in Vancouver, Canada, and is a Canadian citizen.

15.     **Stevenson**, age 55, resides in Vancouver, Canada, and is a Canadian citizen. During all times relevant here, Stevenson resided in London, United Kingdom.

<u>ISSUERS</u>

16.    **KYUS** was a Delaware corporation headquartered in London, Kentucky.  From approximately May 2008 and until its 2010 bankruptcy filing, KYUS held itself out as a business engaged in shale gas exploration in western Kentucky.  During the manipulation scheme alleged herein, its common stock was quoted on the OTCBB and was a penny stock as defined under Exchange Act Rule 3a51-1.

17.    **DYNA** was a Nevada corporation with headquarters in Louisville, Kentucky. During the manipulation scheme alleged herein, DYNA held itself out as a social media and direct marketing business.  At all relevant times, DYNA's common stock was quoted on OTC Link (formerly, "Pink Sheets"), operated by the OTC Markets Group, Inc., under the symbol DYNA and was a penny stock as defined under Exchange Act Rule 3a51-1.

18.    **HBPE**, formerly Lido International, Corp., was a Nevada-incorporated development stage company.  Although HBPE's public filings described it as engaged in "the consulting business in commercial cultivation of champignon mushrooms," its Form 8-K filed with the Commission on September 5, 2013, announced that it had changed its name to HBP Energy Corp., and that it was engaged in discussions about a possible business combination with a private corporation engaged in oil exploration and extraction, Firebird Petroleum, Inc. about a possible business combination.  During the relevant time, HBPE's common stock was quoted on OTC Link, operated by the OTC Markets Group Inc., under its old symbol LIDO and was a penny stock as defined under Exchange Act Rule 3a51-1.

## FACTS

I.    **The KYUS SCHEME**

    A.    **KYUS Corporate Background**

19.    KYUS was incorporated in Delaware in or about September 2006, under the name Las Rocas Mining Corp. ("Las Rocas"). In its public filings, the company claimed that its "principal business plan was to acquire, explore and develop mineral properties and to ultimately seek earnings by exploiting the mineral claims." In fact, the company was a shell formed and controlled by its purported founder (who was also its sole officer and director) and his relatives (together, "KYUS Shell Sellers").

20.    In March 2007, the company filed with the Commission Form SB-2, a registration statement covering a purported public offering of one million common shares, at $0.025 per share, for total offering proceeds of $25,000. The registration statement became effective in or about June 2007. The one million shares covered by the registration statement were sold in or about June 2007 to friends and acquaintances of the KYUS Shell Sellers. These friends and acquaintances were mere nominees of the KYUS Shell Sellers, and at all relevant times, the KYUS Shell Sellers retained control over the shares.

21.    After the purported public offering, the company had three million common shares issued and outstanding: two million restricted shares, previously issued to Las Rocas's sole officer and director, and one million purportedly unrestricted shares distributed in the June 2007 offering and controlled by the KYUS Shell Sellers.

22.    As alleged in greater detail below, on or about October 15, 2007, Gottbetter arranged the purchase of the shell from the KYUS Shell Sellers for approximately $760,000 contributed by Gottbetter, the Trader, the Trader's partners, two promoters based in Ontario,

Canada ("the Trader's Partners"), and Gottbetter's business partner ("Gottbetter's Partner") (together, the "Gottbetter KYUS Group").

23.    Shortly thereafter, on or about October 26, 2007, Las Rocas announced that it had changed its name to Kentucky USA Energy, Inc., and that it was in merger discussions with a private company called KY USA Energy, Inc. ("Privco"); the merger ultimately closed on May 2, 2008.

24.    In late November 2007, and pre-merger, the newly renamed KYUS effected a 12:1 stock split, after which the company had 36 million shares issued and outstanding:  24 million restricted shares held by its purported founder and 12 million purportedly unrestricted shares that, as a result of the shell purchase described in detail below, were controlled by the Gottbetter KYUS Group.

25.    Between the sale of the shell in October 2007 to the Gottbetter KYUS Group, and the closing of the KYUS merger with Privco on May 2, 2008, KYUS was a shell company under the federal securities laws.  The company during this time period had no non-cash assets and no or nominal operations, and it had abandoned its stated initial business plan and was exploring a possible merger.  In some of its public filings during this time period, KYUS expressly stated that it was a shell company.

        **B.**      **Gottbetter's KYUS Stock Promotion Deal**

26.    In or about the summer of 2007, Gottbetter and Gottbetter's Partner met the Trader through a common acquaintance.  Soon thereafter, Gottbetter and Gottbetter's Partner invited the Trader to participate in the KYUS manipulation scheme.

27.    Over the course of several meetings and conversations that occurred in the following weeks and months, Gottbetter, Gottbetter's Partner, and the Trader agreed that the

Trader, working with the Trader's Partners, would: (1) "build the chart" for the KYUS stock –

that is, create seemingly attractive price and volume history for the stock by means of

manipulative trading; (2) distribute a promotional mailer touting the stock, including its

seemingly favorable price and volume history; and (3) fund the promotional mailing with

proceeds from selling KYUS stock in the open market. The three also agreed that, for the

purpose of perpetrating this scheme, Gottbetter would arrange for the Trader and the Trader's

Partners to obtain control of a substantial block of purportedly unrestricted KYUS stock.

28.     Gottbetter arranged for the purchase of the shell from the KYUS Shell Sellers for

$760,000 on or about October 15, 2007. To execute the shell purchase, Gottbetter arranged for a

transfer of all the purportedly unrestricted shell shares from the various nominees of the KYUS

Shell Sellers to himself, Gottbetter's Partner, the Trader and the Trader's Partners, in exchange

for a payment of $760,000 that the KYUS Shell Sellers then split among themselves.

29.     The funds for the shell purchase – $760,000 for payment to the KYUS Shell

Sellers and an additional $46,000 for various fees to Gottbetter's law firm and brokerage firm –

came from the Trader, who contributed $304,000; the Trader's Partners, who together

contributed $300,000; and Gottbetter and Gottbetter's Partner, who contributed $101,000 each.

In return, the Trader received for himself and the Trader's Partners 75% of the purportedly

unrestricted KYUS stock. The remaining 25% of the purportedly unrestricted stock was split

equally between Gottbetter and Gottbetter's Partner.

30.     To conceal their identities and involvement in the planned manipulation, in

purchasing the shell stock, the Trader and the Trader's Partners acted not in their own names but

in the names of one domestic and three offshore brokerage firms where they had membership

interests or accounts (collectively, the "Nominee Entities"). All the stock purchase agreements,

9

prepared by Gottbetter's law firm at his direction, were executed by representatives of the

Nominee Entities; the funds for the stock purchases were wired from the Nominee Entities'

accounts, into an escrow account maintained by Gottbetter's law firm; and, once the stock was

purchased, the shares were deposited in the Nominee Entities' U.S. brokerage accounts at

Gottbetter's law firm's direction.

31.     Gottbetter knew or was reckless in not knowing that the four Nominee Entities

were mere fronts used to conceal the promoters' identities, and that the true purchasers of the

stock were the Trader and the Trader's Partners.

**C.    Manipulative Trading and Fraudulent Promotion of KYUS Stock**

32.     Immediately after receiving their KYUS shares into the Nominee Entities'

accounts in late 2007, the Trader and one of the Trader's Partners ("Promoter A") began

"building the chart" for KYUS stock, in preparation for the distribution of the promotional

mailer and the ultimate sell-off that they executed in May 2008, after the promotion inflated the

stock's price.  The Trader and the Trader's Partners controlled 75% of the public float, and on

many days between late 2007 and May 2008, most and sometimes even all of the market activity

in the stock was in accounts that the Trader and the Trader's Partners controlled.

33.     Among other things, the Trader executed matched trades between the Nominee

Entities' accounts and accounts in the names of the Trader's friends and family members that the

Trader controlled.  The Trader also asked some of his acquaintances among penny stock traders

to buy KYUS stock in the open market (in substance, from the Trader), based on the

understanding that the Trader would be promoting the stock and would give his "buyers" a

heads-up about the upcoming promotion, enabling them to sell the stock at a high price.

34.     The matched trades and the efforts to "bring in buyers" described above had the same twin goals.  First, by liquidating some of their KYUS holdings, the Trader and the Trader's Partners generated the cash that they would later use to fund the KYUS promotional mailing, in accordance with the Trader's agreement with Gottbetter and Gottbetter's Partner.  Second, through these actions, the Trader and Promoter A were delivering on the Trader's promise to Gottbetter to "build the chart" for the KYUS stock, by creating the false appearance of broad market demand and gradually inflating the price.

35.     During the "chart-building" phase of the manipulation, Gottbetter knew or was reckless in not knowing that the Trader and Promoter A were engaging in manipulative trading in the KYUS stock, in accordance with the Trader's agreement with Gottbetter.

36.     In or about May 2008, shortly after the KYUS merger closed, and in accordance with his agreement with Gottbetter, the Trader worked with the Trader's Partners to create and distribute by mail a glossy promotional mailer touting KYUS.  The promotional mailer took the form of an eight-page "newsletter" distributed under the fake name Global Investor Watch.  The mailer touted KYUS stock's seemingly attractive – but contrived – recent stock price history and claimed, falsely, that it had been funded by a $2.4 million payment from a fictional entity called Green Century Capital.  In fact, the Trader funded the KYUS mailer with proceeds from selling KYUS stock, as he had promised Gottbetter.

37.     Gottbetter knew or was reckless in not knowing that the Trader was distributing the KYUS mailer and that the KYUS mailer contained materially false or misleading statements, as alleged above.

38.     The manipulation and fraudulent promotion of KYUS stock were successful. Between late 2007, when the scheme began, and May 2, 2008, the day of the KYUS merger, the

stock price rose from $0.69 per share to $1.70 per share. Once the mailer had been disseminated, the stock price soared in May 2008, reaching $3.97 on May 23, 2008. The volume also increased dramatically. While on all but one day before May 9, 2008, daily trading volume was below 100,000 shares, on each day between May 14 and June 2, 2008, the daily trading volume was over one million shares, and it reached a high of over 4.4 million shares on May 23, 2008.

39.     By the end of May 2008, the Trader and the Trader's Partners had sold approximately 4.4 million shares of the purportedly unrestricted KYUS shares that they had received into the Nominee Entities' accounts in late 2007, for gross proceeds of approximately $10.2 million. They used a portion of these proceeds to fund the printing and distribution of the KYUS mailer, and they shared the remaining proceeds with the issuer and Gottbetter, as alleged in greater detail in Part D below.

40.     Gottbetter and Gottbetter's Partner, for their part, also sold substantial portions of their KYUS stock holdings both during the promotion and thereafter. Gottbetter continued selling KYUS stock through November 2010, and sold virtually all the 1.5 million shares he had received, for gross proceeds of approximately $876,000. Gottbetter's Partner continued selling KYUS stock at least through November 2009, and sold over one million shares, for gross proceeds of over $1.1 million. Gottbetter and Gottbetter's Partner sold their KYUS stock holdings in whole or in part through offshore accounts.

41.     Because Gottbetter, Gottbetter's Partner, the Trader and the Trader's Partners had obtained KYUS stock from the persons controlling the issuer, with a view to selling it to the public, Gottbetter, Gottbetter's Partner, the Trader and the Trader's Partners were statutory underwriters under the Securities Act.

42.     No registration statement was filed or in effect with respect to the KYUS stock sales of Gottbetter, Gottbetter's Partner, the Trader or the Trader's Partners.

**D.     Gottbetter-Orchestrated Sham "Note" Sale**

43.     In late May 2008, Gottbetter and Gottbetter's Partner were struggling to find financing sources for KYUS, which had substantial short-term loan obligations.  In order to avert KYUS's default on those obligations, Gottbetter and Gottbetter's Partner convinced the Trader to funnel to the issuer $2.5 million of his and the Trader's Partners' KYUS stock sale proceeds.  At Gottbetter's suggestion and direction, the transfer was disguised as a financing transaction between one of the offshore Nominee Entities and KYUS, by which KYUS purported to sell a note to the Nominee Entity.  The transfer of funds from the Trader's Nominee Entity account purported to be the proceeds of that note sale.  The note was never repaid.

44.     Of the $2.5 million of the "note" proceeds, KYUS paid out over $500,000 to Gottbetter's law firm and brokerage firm for purported fees related to the transaction.

45.     Gottbetter knew or was reckless in not knowing that the $2.5 million "note" was a mere front for funneling proceeds of unregistered KYUS stock sales from the Trader and the Trader's Partners to the issuer and to Gottbetter.  In fact, in a later conversation in connection with the HBPE scheme, Gottbetter reminded the Trader that the "note" had been the vehicle they had used to disguise the transfer of the KYUS scheme's profits from the Trader to the issuer.

46.     The sham "note" transaction improved KYUS's financial condition, helping the company avoid default on its loan obligations.  As result, in June 2008, Gottbetter's Partner secured a revolving credit line for KYUS from an unaffiliated hedge fund, and Gottbetter was able to sell a substantial portion of his own allotment of KYUS stock in June and July 2008, at still-inflated prices.

E.    **Gottbetter's Role in Concealing the KYUS Scheme**
      **From the Investing Public and the Commission**

47.    At the height of the manipulation and in its immediate aftermath, Gottbetter, in

his dual role as one of the scheme participants and counsel for the issuer, went to great lengths to

conceal his own and the Trader's involvement in the KYUS stock promotion, both from the

investing public and from the Commission.

48.    For example, on or about May 30, 2008, Gottbetter, acting as counsel for KYUS,

drafted and arranged for KYUS to file with the Commission a Form 8-K asserting that KYUS

had no connection to the KYUS mailer.  Specifically, the Form 8-K stated that KYUS had "no

relationship with Global Investor Watch [the fake name under which the KYUS Mailer was

distributed], Green Century Capital [the fake entity that purportedly commissioned the KYUS

Mailer], or anyone else affiliated with Global Investor Watch, or its publications, past or present,

and [had] not engaged Global Investor Watch, Green Century Capital, or any other person or

entity to prepare such brochures."

49.    Gottbetter knew or was reckless in not knowing that the 8-K was materially false

or misleading.  As alleged above, Gottbetter had himself recruited the Trader to create and

distribute the KYUS mailer, and also arranged for the Trader and the Trader's Partners to receive

75% of KYUS's purportedly unrestricted shares, in part as compensation for creating and

distributing the KYUS mailer.

50.    On July 2, 2008, in response to a Commission request for information about the

KYUS mailer, Gottbetter, again as counsel for KYUS, assured the Commission staff in a letter

that there had been no undisclosed payments to any individual or entity for stock promotion

services.  Gottbetter knew that that representation was false or misleading because he himself

had arranged for the transfer of pre-pump KYUS shares to the Trader and the Trader's Partners

so that they could engage in the manipulative trading and promotional activities, and as compensation for their stock promotion services.

## II.   THE DYNA SCHEME

### A.   DYNA's Corporate Background

51.   DYNA was incorporated in Nevada in 2005 under the name Medical Design Studios, Inc.  The company initially purported to be in the business of digital medical illustrations and animation for litigation involving medical issues.

52.   In 2010, the company became a shell.

53.   In late 2011, the company changed its name to Dynastar Holdings, Inc., in anticipation of a merger with Dynastar Ventures, Inc., a Delaware corporation; that merger closed in January 2012.

54.   Although DYNA common stock was quoted on OTC Link, during the relevant times, there was only minimal trading in the stock other than the trades discussed below.

55.   During the relevant time, DYNA held itself out as a social media and direct marketing business.

56.   During the relevant time, Gottbetter and his business associates owned or controlled over 5 million of DYNA's purportedly unrestricted shares, or approximately one-third of all the outstanding purportedly unrestricted DYNA shares.

### B.   Gottbetter's DYNA Stock Promotion Deal and Resulting Trades

57.   In the second half of 2012, Gottbetter approached the Trader and asked him to return to penny stock manipulation, a "business" from which the Trader had retired shortly after the KYUS scheme.  Gottbetter told the Trader how much he needed someone to do for the DYNA stock what the Trader had previously accomplished for the KYUS stock.

58.     Over the course of multiple meetings that occurred between late 2012 and April 2013, Gottbetter asked the Trader to create volume in the DYNA stock, to make the stock attractive to potential investors in various private financing transactions that Gottbetter would broker for the company.  The Trader agreed and told Gottbetter that he would accomplish this goal by trading with a partner, to avoid obvious wash trading; that the purpose of the trading between the Trader and his partner would be to "build a chart" for the DYNA stock; and that following the "chart-building" phase of the scheme, the Trader would distribute by mail or email a promotional mailer for the stock that, among other things, would tout the recent – in fact, fake – "market" activity in the stock created by the Trader's and his partner's trading.

59.     To put this scheme in motion, in early 2013, Gottbetter arranged the sale of a block of 1.5 million purportedly unrestricted DYNA shares at five cents per share, for $75,000 in total, in a private, non-market transaction from one of Gottbetter's business associates to an entity controlled by the Trader's partner.  Gottbetter discussed with the Trader Gottbetter's expectation that the Trader should be able to profit by selling this stock during the planned promotion.

60.     On April 11, 2013, the Trader met with Gottbetter to discuss drafts of the promotional mailer that the Trader had prepared for distribution in the DYNA scheme.  Similar to the KYUS mailer, the DYNA mailer was materially false and misleading.  For example:

- The mailer carried a fake "newsletter" name, "Growth Stock Guru," a nonexistent entity again selected to create the illusion of legitimacy for the promotion;

- The newsletter depicted and touted the planned market activity in the DYNA stock without disclosing that the favorable price and volume trends were to be generated by manipulative trading between the Trader and his partner; and

- The disclaimer in the newsletter did not disclose either the Trader's or Gottbetter's involvement in the promotion, attributing the mailer entirely to the fake "Growth Stock Guru."

61.     During the April 11, 2013 review of the mailer with Gottbetter, the Trader presented Gottbetter with three options for a stock price projection that was to be included in the mailer: $1.25 per share, $3.75 per share, and $7.50 per share. Gottbetter took his time considering the three options and settled on the $3.75 per share projection, noting that $3.75 would appear more realistic. At the end of the meeting, when the Trader offered to leave the drafts of the mailer with Gottbetter, Gottbetter refused to keep the drafts and said, "I never saw it."

62.     On June 12, 2013, the Trader informed Gottbetter that, in order to begin building the chart for the DYNA stock, as they had previously agreed, and while waiting for the Trader's partner's brokerage firm to accept the previously purchased 1.5 million share block for trading, the Trader would start making small open market purchases of the DYNA stock in the coming days. Gottbetter agreed to this proposal.

63.     On June 13, 2013, in accordance with his agreement with Gottbetter, the Trader executed two open market purchases of 2,500 DYNA shares each, at the price of $0.20 per share. Subsequently, the Trader called Gottbetter and informed him that he had begun building the chart for the DYNA stock, as they had previously agreed.

64.     Soon after, Gottbetter called the Trader with the promise of an even bigger scheme, putting the DYNA promotion on hold while they both turned their attention to the more complicated and potentially more lucrative "deal" with the promoters of an oil and gas venture called HBPE.

### III.   THE HBPE SCHEME

#### A.     HBPE's Corporate Background

65.     Before its September 2013 name change, HBPE was called Lido International Corp.  It had been incorporated in October 2012 in Nevada and identified itself in public filings as a development stage company with limited operations and headquartered in Sonsonate, El Salvador.

66.     Pursuant to a Registration Statement filed with the Commission and declared effective on February 28, 2013, HBPE registered a purported public offering of up to 4,000,000 shares of its common stock.  By September 2013, HBPE had issued approximately 900,000 purportedly unrestricted shares of stock pursuant to that Registration Statement.

67.     On August 29, 2013, HBPE declared a forward 33:1 stock split, giving the holders of the purportedly unrestricted shares approximately 32 additional shares for each share they owned, and creating a total of 30 million purportedly unrestricted shares.

68.     As both Gottbetter and Stevenson acknowledged in a meeting with the Trader on September 11, 2013, Gottbetter, Adam and Stevenson together controlled all of the outstanding purportedly unrestricted shares, either directly or through nominees.  Approximately 1.3 million shares were allocated directly to a Gottbetter-controlled entity, Gottbetter Capital Group.

**B.**     **The Manipulative Trading and Promotional Plans for the HBPE Scheme**

69.     On July 19, 2013, from an airport runway as his plane was about to take off, Gottbetter placed a hurried call to the Trader to enlist the Trader in a new "deal" that Gottbetter would be "running," with a group "out of London."  Gottbetter called the Trader with more details the next day, and, in that call, he told the Trader that he had been approached by a "big hitter" from London with a new oil and gas "deal," and that this "big hitter" was looking for someone to "run the market" for the "deal" and to "walk it up."  Gottbetter invited the Trader to join the scheme in that role.

70.     In subsequent conversations, Gottbetter identified Stevenson and Adam as the "big hitters" and HBPE as the new oil and gas "deal."  The Trader's role in the "deal" was, as Gottbetter put it, to "run the market, walk it up" – that is, to engage in manipulative trades, including pre-arranged matched trades, executed at increasing prices, and thus to "build the chart" for the stock, just as the Trader had done for the KYUS stock and had begun to do for the DYNA stock.  This attractive but fake stock chart would reflect both increased volume and increased prices, and would be used in conjunction with other promotional activities to build investor interest and buying, further inflating the price of the stock.  As Gottbetter, Adam and Stevenson explained in later meetings, the group planned an extensive promotional campaign involving the paid endorsement of the stock by a prominent Fox Business Network guest analyst, a mass mailer of his endorsement and other promotional materials, and the deployment of multiple offshore call centers, or "phone rooms," to execute a cold-calling campaign touting the stock.

71.     On August 21, 2013, at Gottbetter's direction, the Trader met Adam and Stevenson for the first time at a boutique luxury hotel on the Upper East Side of Manhattan,

where Adam and Stevenson were staying.  Over the course of nearly three hours, with Gottbetter

calling in to join some of the meeting, the three discussed the scheme, and the Trader told Adam

and Stevenson how he could gradually raise the price of the stock in trading that could not be

traced back to him.  The Trader also described an electronic trading system  – or algorithm – that

he had devised to trade among 32 accounts, each held by a foreign nominee and controlled by the

Trader, in matched trades at pre-arranged prices.

72.     At that August meeting, the Trader asked Stevenson if he wanted the Trader to

move the stock up to a dollar, or just $0.50 a share through the matched trades.  Stevenson

responded:  "[L]et's say we'll do half a million at 50 cents and another half a million to a million

between 50 cents and a dollar and then we'll move it up to a buck-fifty again with you doing it."

Adam summarized the initial trading plan:  "So what'll happen is the [stock] split will take place

in three weeks, and let's call it September 15, and then you'll do some trades, and then you'll

walk it to a price and say 'let's turn on the phone room.'"

73.     Stevenson also told the Trader that he would be expected to provide artificial

price support by buying the stock as needed throughout the elaborate email and cold-calling

promotional activities that they planned for the stock, all touting HBPE as a promising

investment.  At the August 21, 2013 meeting, Stevenson told the Trader: "You've got to be there

if it's showing some weakness . . . Whenever it shows some weakness you're on the bid all of a

sudden for 50 or 100 thousand of the stock and that keeps everybody feeling good."

74.     Stevenson explained that the Trader's manipulative trading would serve two of

Stevenson's goals:  (a) to create activity in the stock that bankers wanted to see before they

would help him raise capital for the company; and (b) to make himself some money, presumably

when he sold his own shares at inflated prices.

75.    At that August 21 meeting, and in several subsequent meetings and calls among Gottbetter, Adam, Stevenson, and the Trader, including meetings and calls among some or all of them on August 22, September 11, 13, 16, 17, 20 and October 1, 7, 22, and 28, 2013, Gottbetter, Adam and Stevenson described in detail their elaborate plans for manipulating the price of HBPE stock throughout the Fall of 2013, including the following:

(a)    Gottbetter, Adam and Stevenson, or persons or entities they controlled, would control all of the purportedly unrestricted shares of HBPE, obtained through share purchases arranged by Gottbetter.

(b)    Through a stock purchase agreement prepared by Gottbetter or at his direction, the Trader's nominee would purchase 5 million of the purportedly unrestricted HBPE shares from one of Adam's nominees.  That transaction was effected as planned when the stock was purchased by wire transfer on October 7, 2013 to Gottbetter's escrow account from an account located in New Jersey.

(c)    Once the Trader had bought most of the remaining purportedly unrestricted shares for his 32 accounts, at pre-arranged prices and in matched trades, from Adam's and Stevenson's nominees in open market transactions, the Trader would begin to trade using his algorithm among those 32 accounts and – in Stevenson's words – "manipulat[e] the stock through [his] accounts" by gradually increasing the price of the stock.

(d)    Stevenson would then "bring in buying" – planned at $1 million or more – to further create volume and price increases.  The "buyers," Stevenson's nominees or associates, would execute their purchases through matched trades with one or more of the Trader's 32 accounts.  As Stevenson explained, "[t]hese are my good

guys.  They will hold the stock, and they will call me one day and ask, can I sell? And I will say yes or no."

(e)    Adam would arrange and pay for the listing of HBPE on the Frankfurt, Germany exchange, and he and Stevenson would then launch a European "road show" through which they would promote the stock to European buyers.

(f)    With the proceeds the Trader earned from his early trading and the sales to the Stevenson's buyers, the Trader would buy HBPE shares from Adam's controlled accounts in still more pre-arranged and matched trades, and thus funnel his early proceeds to Adam.  Adam would then use those proceeds to fund a cold-calling campaign from multiple "call rooms" all over the world, and to fund the hard mail and electronic advertising campaigns touting HBPE stock.

(g)    As Gottbetter noted in explaining the promotion time-line to the Trader during a meeting with Stevenson on September 11, 2013, the Trader would "have the full month of November to walk the price to wherever he wants it walked, [and then] the mail drops December 1 – it's perfect."

(h)    Once the promotional efforts were underway, the Trader would funnel to Adam and Stevenson additional proceeds garnered from sales into the inflated market by purchasing other securities or assets owned by them.

(i)    After the intended rise of the stock price from the manipulative trading and the promotional campaign, Gottbetter, Adam, Stevenson and their nominees would sell their shares into the market at the inflated prices, and Gottbetter, Adam, Stevenson, and the Trader would split the total profits from the scheme according to the percentages they had agreed to.

76.     In early October 2013, as the scheme was getting under way, Stevenson encountered difficulties in getting his allocated shares approved for trading by the offshore broker-dealer (the "Offshore BD") where he had deposited his stock certificates. According to Gottbetter, who was orchestrating the allocation and deposits of the stock certificates among Adam's and Stevenson's nominees and their respective broker-dealers, the Offshore BD refused to accept the shares for trading until there was open-market trading in HBPE stock (still trading under its pre-name change symbol, "LIDO") at prices above $0.05 a share. To solve that problem, in a meeting on October 1, 2013 at Gottbetter's offices, Gottbetter proposed that Adam and Stevenson (acting through nominees) and the Trader engage in a few small, pre-arranged matched trades at $0.05 a share.

77.     On October 7, 2013, in a telephone conversation among Adam, Stevenson and the Trader, Stevenson told Adam and the Trader that the Offshore BD was now insisting that it would only accept the share certificates after it saw that the stock traded at at least $0.10 a share. Because the manipulation scheme needed all of Adam's, Stevenson's and their nominees' shares to be available for open market purchase by the Trader, Stevenson directed a different nominee, holding shares at a domestic broker-dealer, to enter a "sell" order for 5,000 HBPE shares at $0.10 a share in the open market, to satisfy the Offshore BD's requirements.

78.     On October 28, 2013, Adam and Stevenson called the Trader to make sure that the plan to buy most of the remaining unrestricted shares was on track and ready to start that week. The Trader assured Adam and Stevenson that he was almost ready to start buying the shares from Adam's and Stevenson's nominees in pre-arranged open-market transactions. The Trader also voiced a concern that, because the public bid was at that time higher than the price at which the Trader had agreed to purchase the HBPE shares, his trades might arouse suspicion if

he effected them at the agreed-upon price of $.02 a share, rather than the then-current bid of $0.15 a share.  To artificially and gradually reduce the price of the stock, Adam and Stevenson decided that they should begin trading small amounts during that week between accounts they controlled, at lower prices than the current bid.

79.    Adam and Stevenson engaged in small, matched trades in their nominees' accounts during that week, in accordance with the plan agreed upon on October 28.  Between October 29 and November 1, 2013, Adam and Stevenson discussed these matched trades with Gottbetter.  The HBPE scheme was thwarted soon thereafter, when Stevenson was arrested by the FBI.

### FIRST CLAIM FOR RELIEF
#### (Gottbetter)
### Violations of Sections 5(a) and 5(c) of the Securities Act

80.    Paragraphs 1 through 79 are incorporated by reference as if set forth fully herein.

81.    By virtue of the foregoing, and with respect to the KYUS scheme, Gottbetter, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was applicable.

82.    By virtue of the foregoing, Gottbetter violated and, unless restrained and enjoined, will continue violating, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c).

## SECOND CLAIM FOR RELIEF
### (Gottbetter)
### Violations of Section 17(a) of the Securities Act

83.     Paragraphs 1 through 79 are incorporated by reference as if set forth fully herein.

84.     By virtue of the foregoing, and with respect to the KYUS scheme, Gottbetter, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities:  (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

85.     By virtue of the foregoing, Gottbetter violated and, unless restrained and enjoined, will continue violating, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF
### (Gottbetter)
### Aiding and Abetting Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5(b) Thereunder

86.     Paragraphs 1 through 79 are incorporated by reference as if set forth fully herein.

87.     By virtue of the foregoing, and with respect to the KYUS scheme, Gottbetter, directly or indirectly, provided knowing and substantial assistance to persons who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

88.     By virtue of the foregoing, Gottbetter aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b), in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

### FOURTH CLAIM FOR RELIEF
#### (Gottbetter, Adam and Stevenson)
#### Violations and Aiding and Abetting  Violations of Section 10(b)
#### of the Exchange Act and Rules 10b-5(a) and 10b-5(c) Thereunder

89.     Paragraphs 1 through 79 are incorporated by reference as if set forth fully herein.

90.     By virtue of the foregoing, Gottbetter, Adam, and Stevenson, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud; and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

91.     By virtue of the foregoing, Gottbetter, Adam and Stevenson violated and, unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c).

92.     In the alternative, by virtue of the foregoing, Gottbetter, Adam and Stevenson provided knowing and substantial assistance to persons who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud, and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

93.     By virtue of the foregoing, Gottbetter, Adam and Stevenson aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c), in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Gottbetter, and each of his agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Sections 5(a), 5(c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### II.

Permanently restraining and enjoining each of Adam and Stevenson, and their respective agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**III.**

Prohibiting Gottbetter from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

**IV.**

Prohibiting each of Adam and Stevenson from participating in any offering of penny stock pursuant to Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

**V.**

Ordering each of Gottbetter, Adam and Stevenson to disgorge his respective ill-gotten gains received as a result of the conduct alleged herein, plus prejudgment interest thereon.

**VI.**

Ordering Gottbetter to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**VII.**

Ordering each of Adam and Stevenson to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VIII.

Granting such other and further relief as this Court deems just and appropriate.


Dated: May 26, 2015
       New York, New York

                        SECURITIES AND EXCHANGE COMMISSION

                        By: _____

                             Andrew M. Calamari
                             Regional Director
                        SECURITIES AND EXCHANGE COMMISSION
                        Brookfield Place, 200 Vesey Street
                        New York, New York 10281-1022
                        (212) 336-1023 (Brown)
                        Attorney for Plaintiff


Of Counsel:
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

## **LOCAL CIVIL RULE 11.2 CERTIFICATION**

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceeding.  The following related criminal cases are pending before this Court: United States v. Gottbetter, 14-CR-467 (JLL); United States v. Adam, 15-MJ-03594 (MF); and United States v. Stevenson, 13-CR-777 (JLL).


SECURITIES AND EXCHANGE COMMISSION

By: _____

Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff


Of Counsel:
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

## DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.1(f)

Per the requirements of Local Civil Rule 101.1(f), the undersigned hereby designates the

United States Attorney for the District of New Jersey to receive service of all notices or papers in

this action at the following address:

> Chief, Civil Division
> United States Attorney's Office
> District of New Jersey
> 970 Broad Street, Ste. 700
> Newark, New Jersey 07102

SECURITIES AND EXCHANGE COMMISSION

By: _____

Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh